Moise KATZ, Bernice Berger, Barnett Stepak, Gary Goldberg, Joel Blake, Steven Verkouteren, Bruce Doniger, Diversified Imaging Supply Corporation, Joseph E. Kovacs, Phyllis Freiman, Maria Figueroa, Larry Neuman, and Olga Fried, Plaintiffs,

v.

Donald A. PELS, Leland S. Brown, William G. Herbster, Wilma H. Jordan, Richard W. Kislik, Thos. H. Law, and David M. Naseman, Defendants,

and

LIN Broadcasting Corp., Nominal Defendant.

No. 90 Civ. 7787 (KTD).

United States District Court, S.D. New York.

July 22, 1991.

Wolf Popper Ross Wolf & Jones (Laurence D. Paskowitz, of counsel), and Wechsler Skirnick Harwood Halebian & Feffer (Robert I. Harwood, Andrew D. Friedman, of counsel), New York City, for plaintiffs.

Cravath, Swaine & Moore (Paul C. Saunders, Anthony B. Ullman, Peter L. Skolnik, Kathleen M. Nicholson, of counsel), New York City, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Goodkind Labaton & Rudoff, Law Office of Curtis V. Trinko, Zwerling, Schachter & Zwerling, Abbey & Ellis, Garwin, Bronzaft, Gerstein & Fisher, Stull, Stull & Brody, New York City, for defendants.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff Moise Katz, Bernice Berger, Barnett Stepak, Gary Goldberg, Joel Blake, Steven Verkouteren, Bruce Doniger, Diversified Imaging Supply Corporation, Joseph E. Kovacs, Phyllis Freiman, Maria Figueroa, Larry Neuman, and Olga Fried (collectively "Katz") commenced this action on behalf of nominal defendant LIN Broadcasting ("LIN") for an alleged failure to disclose certain material facts relating to LIN's 1966 and 1969 Stock Option Plans ("the Plans") in a proxy statement dated April 7, 1989 and in violation of § 14(a) of

the Securities and Exchange Act of 1934 ("1934 Act"). Pendent thereto, Katz claims that defendants Donald Pels, Leland S. Brown, William G. Herbster, Wilma H. Jordan, Richard W. Kislik, Thos. H. Law, and David M. Naseman (collectively "Pels") breached their fiduciary duties by making excessive payments to themselves pursuant to the Plans and that such payments constituted "corporate waste." Pels now moves pursuant to Fed.R.Civ.P. 23.1 for Katz's failure to make a demand on the corporation before a derivative action may be brought. Second, Pels moves pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6) dismissing the corrected complaint because "as a matter of law, the proxy statement at issue fully and fairly disclosed all material facts." Finally, Pels asks that the pendent state claims be dismissed for insufficiency as a matter of law.[1]

## STATEMENT OF FACTS

■ On August 10, 1988, LIN's Board of Directors unanimously adopted amendments to LIN's 1966 and 1969 Stock Option Plans (the "Amendments"). Amended Complaint ¶ 14. The Amendments provided, *inter alia* that in the event of a "Change in Control" (as defined in the Amendments), officers of the Company who held stock options would be entitled to surrender them to the Company to the extent that they were then exercisable and vested for cancellation at the higher of two specified prices. In exchange for surrendering an option, an officer would be entitled to

a cash payment equal the product of (x) the difference between the purchase price of such shares under the portion of the option so surrendered and the fair market value of such shares, which will

be the greater of (i) the highest selling price of the Common Stock on the National Market System of NASDAQ (or any other principal market on which the Common Stock is then traded) during the 90–day period prior to the date of surrender of such option, and (ii) the highest price paid to any holder of Common Stock in the transaction or group of transactions resulting in such Change in Control, times (y) the number of such shares.

Amendments to 1966 and 1969 Stock Option Plans, at A–1.[2]

A "change in control" occurred when on April 13, 1988, it was announced that McCaw Cellular Communications, Inc. ("McCaw"), a rival telecommunications company, had acquired approximately 5.46 percent of LIN's common shares. On August 10, 1988, LIN's Board of Directors adopted certain amendments to the Old Stock Option Plans which were purportedly aimed at ensuring that LIN insiders would be treated equitably in the event of a change in control. The Amendments were subject to shareholder approval. LIN's directors submitted the Amendments for such approval by means of the Proxy Statement dated April 7, 1989, at a stockholder's meeting held on May 25, 1989. Amended Complaint ¶¶ 15, 16. By a vote of 37,708,-455 in favor and 3,181,675 opposed, the shareholders approved the Amendments. Amended Complaint ¶ 16.

The Proxy Statement described the Amendments, and the Amendments themselves were annexed to the Statement. Explained within the documents was that upon a "Change in Control" as defined by the Amendments, each vested option held by an officer would be redeemable in

---

1. It would appear from Pels' submissions that it undertakes to cloak a motion for summary judgment as one pursuant to Fed.R.Civ.P. 12(b). I will neither convert the motion, nor treat it as one for summary judgment. Accordingly, the facts of the complaint are assumed true and the allegations will be viewed in a light most favorable to the non-movant. Perhaps, the most egregious "waste of corporate assets" is by paying counsel fees for a motion which, by being brought under the wrong rule, had little or no chance of success.

2. Documents quoted and/or incorporated by reference into the pleadings may be considered without having to convert a motion to dismiss into one for summary judgment. *National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories Div. of/and American Home Products Corp.,* 850 F.2d 904, 910 n. 3 (2d Cir.1988); *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985).

exchange for cash equal to the appreciated value of the shares covered by the option. Such appreciated value will be the difference between the aggregate exercise price of the shares covered by the option so surrendered and the greater of (i) the highest market price of the Common Stock during the 90–day period prior to the day of surrender, and (ii) the highest price paid to any stockholder of the Corporation in the transaction or group of transactions resulting in the change in control.

Amended Complaint ¶ 15.

On June 7, 1989, McCaw commenced a tender offer for LIN. Amended Complaint ¶ 17. Initially, McCaw offered to purchase all the LIN shares that it did not own at $120 per share, but subsequently reduced that price to $110 per share. Amended Complaint ¶ 17. When that offer was rejected, McCaw eventually, *inter alia*, offered to purchase approximately 47 percent of the outstanding shares at a price of $154.11 per share, thus triggering the Amendments' provisions such that certain of LIN's option holders redeemed their options for the difference between the exercise price of the options and $154.11, which constituted the "highest price paid to any holder of Common Stock" in the tender offer. Amended Complaint ¶¶ 21, 21.

## DISCUSSION

■ Federal proxy rules apply to all companies with securities registered under § 12 of the 1934 Act.[3] The solicitation of proxies by corporate management constitutes an effective means of establishing or maintaining control over large public corporations. Section 14(a) of the Federal proxy rules was enacted to prevent abuses in the proxy solicitation process. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Its objectives

are essentially to encourage full disclosure and prevent fraud. *See* § 14(a) of the 1934 Act, § 78n(a), and rules 14a–8, 14a–9, 17 C.F.R. 240.14a–8, a–9 promulgated thereunder. Under the federal rules, this action may not be dismissed unless it can be shown that it is beyond doubt that plaintiffs can prove no set of facts in support of their contention that LIN's April 7, 1989 proxy statement misrepresented and/or omitted material facts[4] regarding certain amendments to LIN's existing stock option plans.

According to the well-pleaded facts in the complaint, the following may be gleaned. Certain older stock option plans existed in LIN, the exercise of which was premised on the fact that the exercise price of the options could not be less than 100 percent of the fair market value of the common stock at the time of the grant. If an insider thereafter exercised his options, his gain would be the difference between the price at which the options had been granted and the price at which the stock was trading on the date of exercise. Thus, if an insider was granted options at an exercise price of $10 per share, and exercised those options when the stock price reached $50 per share, the insider's gain would be $40 per share. This constituted the same benefit that a public shareholder could realize if the public shareholder had purchased shares at the same time the insider was granted the option. Thus, under the old stock option plans, the fortunes of the corporate insiders were tied directly to the fortunes of the public shareholders.

For a situation where a change in control of the corporation was imminent, special rules applied to the exercise of preexisting options. In such event, Pels and ten other top LIN officers had the contractual right up to one year after the change in control to sell shares acquired pursuant to options

---

**3.** The proxy regulations apply only to the registered equity securities of companies registered under § 12(g) of the 1934 Act. LIN is so registered.

**4.** *See Folger Adam Company v. PMI Industries, Inc.*, 938 F.2d 1529 (2d Cir.1991) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438,

449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)) (omitted or misrepresented fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote, or if the fact "would have assumed actual significance in a reasonable investor's decision on whether to consummate the transaction.")

to the Company at a price equal to the "average market price of the Common Stock for the 30–day period prior to the change of control." 1989 Proxy Statement, at 6. Accordingly, if a change of control were to occur, the top insiders were to receive no more for their stock than the average trading price of LIN common stock for a period of days prior to that change in control. Thus, even in a change of control, the benefits to be enjoyed by insiders were on a par with the benefits realizable by public shareholders.

According to the Amendments, insiders could surrender their options to LIN following a change of control, and receive from LIN the difference between the exercise price of their options and the higher of: (a) the highest selling price of LIN stock during the ninety-day period prior to the surrender of their options; or (b) "the highest price paid to any holder of Common Stock in the transaction or group of transactions resulting in a change of control." 1989 Proxy Statement, at A–1. In recommending approval of the Amendments, the Proxy Statement indicated that the Amendments were necessary to ensure the equal treatment of insiders who, absent the Amendment, "might be unable to realize the price paid to other stockholders of the Corporation in the transaction or transactions resulting in the Change in Control." 1989 Proxy Statement, at 12.

When, on June 7, 1989, McCaw announced a tender offer aimed at acquiring control of LIN, it proposed to purchase all of the 46 million publicly-held LIN shares that it did not own for $120 per share. After rejecting numerous revised offers by McCaw, LIN's Board announced that it would accept and endorse a proposal by McCaw requiring McCaw to make a partial tender offer only for 21.9 million or approximately one-half of all publicly held shares at a price of $154.11.

Under the McCaw partial offer, LIN's public shareholders were free to tender all of their shares to McCaw, but McCaw was only obligated to purchase approximately one-half the tendered shares, assuming all of LIN's public shareholders tendered.

Shares in excess of its obligation and not purchased by McCaw would then be returned to the shareholders to sell in the open market for whatever that would bear. That price was substantially lower than $154.11 per share. In essence, McCaw offered to pay LIN's public shareholders $154.11 for every two shares that a public shareholder owned while all of the corporate insiders were able to unload their blocks of shares in whole, thus realizing $154.11 for each and every one of their shares.

The McCaw partial offer closed on March 5, 1990, and it purchased about 47 percent of the 46 million shares tendered by the public, thus acquiring a 52 percent interest in LIN. Any LIN shares not purchased were returned to their owners, trading on the open market for only about $80–$85 per share. By January 14, 1991, LIN closed at a price of $53.12 per share.

Unbeknownst to the public shareholders at the time they approved the amendments, Pels did not construe the Highest price provision in accordance with its plain language, but rather viewed it as allowing corporate insiders to receive the "highest partial price" paid to any shareholder in a partial or multi-tiered offer. Thus, Pels received payment from LIN of $154.11 for each and every LIN option he and other insiders held, even though no such price was offered to any public shareholder by McCaw pursuant to its partial offer. Under Pels formula, he personally walked away with $186 million. That, in hand with what other insiders received amounted to approximately $232 million.

■ At the time of the 1989 proxy solicitation, Katz avers that Pels omitted to inform shareholders that, in a change of control transaction involving a partial or multi-tiered tender offer, the Highest Price Provision of the Amendments would be construed to allow corporate insiders to receive payments far in excess of the payments made available to the public shareholders in the change in the control transaction.

Katz certainly presented sufficient facts to make out a § 14(a) claim for material

omissions in the proxy materials. Indeed, the nature and effect of the latest LIN amendments misrepresented and/or omitted several facts. The proxy statement misrepresented that the Amendments would enable LIN's optionholders "to realize the price paid to other stockholders of the Corporation in the transaction ... resulting in the change of control" when the Amendments enabled optionholders to realize far in excess of that amount. It is possible that, if the proxy materials were forthright and open, non-option holding shareholders would not have bound themselves to an amendment which potentially doubles the optionholder's ability to realize a gain in a "change of control" situation.

Moreover, the Proxy Statement failed to disclose that the Amendments created a potential conflict of interest between LIN's management and its stockholders because the Amendments provided management with a strong incentive to favor a front-loaded partial offer over a lower all-shares offer, even though such partial offers are allegedly coercive and far riskier economically to public shareholders than all-shares offers. Also, the Proxy statement misrepresented that "optionholders will receive the economic benefits of awards that have been granted to them prior to the occurrence of the change in control" when, in fact, in the event of a change in control, (as compared with the old stock option plans,) the Amendments materially increased optionholders' economic benefits.

■ In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure. *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 994 (2d Cir. 1988); *see also Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 773–74 (3d Cir.1976) (plaintiff claiming proxy violations was properly awarded summary judgment where proxy in question obscured the fact that insiders would be paid more than public shareholders in a corporate merger and where proxy "nowhere [contained] a statement giving emphasis to the conflicts

of interest.") For example, the representation in the Proxy Statement that, absent the Amendments, optionholders "might be unable to realize the price paid to other stockholders" was materially misleading. In the McCaw transaction, the Amendments enabled optionholders to realize a total price for their options far in excess of that paid to LIN shareholders. Allegedly, the impression conveyed by the Proxy Statement was that the Amendments were designed to achieve parity between optionholders and stockholders. As asserted, had the apparent disparity been properly disclosed in the Proxy statements, the Amendments would likewise not have prompted such an overwhelmingly positive response by the shareholders at its May 25, 1989 meeting.

■ Although Pels attempts in its submissions in opposition, to argue the merits of the case, it needed only to show that Katz can prove no set of facts in support of their contention that LIN's April 7, 1989 proxy statement misrepresented and omitted material facts regarding certain amendments to LIN's existing stock option plans. By a well-pleaded complaint, Katz however, amply provides allegations which if true would make out a claim for federal proxy law violations. The plaintiffs are not required to prove anything more to establish liability and damages than that the proxy misrepresented or omitted material information. *See Mills v. Electrical Auto–Lite Co.*, 396 U.S. 375, 384–85, 90 S.Ct. 616, 621–22, 24 L.Ed.2d 593 (1970), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) (rejecting the notion that proof of a proxy violation requires a showing that the defects in the proxy statement "actually had a decisive effect of the voting.") As such, the complaint pleads sufficient facts to withstand this motion to dismiss.

### I. Demand on the Board for Direct and Derivative Federal Claims

Pels moves to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 23.1 which, in pertinent part, mandates that a shareholder derivative suit be dismissed if a plaintiff fails to "allege with particularity

the efforts, if any, made by the plaintiff to obtain the action [he] desires from the directors or comparable authority ... and the reasons for [his] failure to obtain the action or for not making the effort."

> [r]ule 23.1 ... has its historical origin in a perceived evil, the maintenance of strike suits by minority shareholders which impeded corporate management at great cost and to little purpose except the enrichment of counsel, coupled also with unnecessary premature interference by outsiders with internal corporate affairs, which should have been administered at least in the first instance by those elected by the shareholders to do so.

*Lewis v. Anselmi*, 564 F.Supp. 768, 772 (S.D.N.Y.1983).

Thus, the rationale for requiring that a demand be made on the Board logically affords the directors "an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" *Kamen v. Kemper Financial Services, Inc.*, — U.S. —, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533, 104 S.Ct. 831, 837, 78 L.Ed.2d 645 (1984)). Because the onus was upon Katz to comply with that federal mandate and they failed to comply by making the requisite demand on the LIN Board, Pels avers such is fatal to sustaining the action at bar.[5] However, Katz avers that the claims alleged in the Amended Complaint are not only derivative, but direct and thus no demand is required if it can be shown that making such a demand would merely constitute a futile effort.

Indeed, where a suit is individual as well as derivative in nature, then no such demand is required, nor required shown futile, for the claims may be sustained in the alternative. Even a proxy claim, seeking a damage remedy on behalf of the corporation, cannot be classified solely as derivative. Rather a misrepresentation claim regarding a proxy statement may be deemed both direct and derivative in light of the fact that a plaintiff may directly seek a declaratory ruling that a proxy solicitation was invalid. Moreover, shareholder's are oft due a direct return of the funds wrongfully paid out, regardless whether it is determined that the corporation was injured as well. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).

> While it is true that [*Borak*] suggests that the primary injury pursuant to a deceptive proxy flows from damage done to the corporation, it is also true that *Borak* explicitly recognizes the right of a shareholder to bring both direct and derivative actions.... We therefore hold that in light of ... *Borak*, a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and derivative suits. The former action protects the shareholders' interest in "fair corporate suffrage."

*Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir.1977); *see also Citibank, N.A. v. Data Lease Financial Corp.* 828 F.2d 686, 694 n. 11 (11th Cir.1987), *cert. denied*, 484 U.S. 1062, 108 S.Ct. 1019, 98 L.Ed.2d 985 (1988) ("shareholder need not assert his rights through the corporation if he can show the violation of a duty owed directly to him.")[6]

---

**5.** Under Delaware law, the state where LIN was incorporated, a plaintiff asserting proxy claims need not comply with the demand requirement. *See In Re Tri–Star Pictures, Inc. Litigation*, No. 9477, 1990 WL 82734, 1990 Del.Ch. LEXIS 80 (Del.Ch. May 31, 1990) (false Proxy claims are not subject to the demand requirement of Delaware Chancery Court Rule 23.1 because to view such claims as wholly derivative would be unsound.)

**6.** Finally, although in the case of *Kamen v. Kemper Financial Services, Inc.*, the Supreme Court would not expound on the direct nature of federal proxy claims, it did state that shareholders may bring a direct action in cases which involve proxy claims under § 20(a) of the Investment Company Act, 15 U.S.C. § 80a–20(a). According to the SEC's Amicus Brief in that case, 15 U.S.C. 80a–20(a) is virtually identical to the proxy provision of the Security and Exchange Act of 1934, § 14(a), 15 U.S.C. 78n(a). SEC Amicus Brief, p. 2 n. 1. Thus, it would appear logical that a direct action may be sustained for a federal proxy claim pursuant to § 14(a) of the 1934 Act.

## II. *Demand on the Board and State Derivative Claims*

Nevertheless, Pels asserts that the "universal demand rule," as delineated by the American Law Institute and adopted by the Seventh Circuit, is controlling, requiring Katz to have made a demand on the LIN Board or show why such a demand would have been futile. As delineated by the American Law Institute, the universal demand rule completely abolishes the "futility" exception. *See RCM Securities Find, Inc. v. Stanton,* 928 F.2d 1318 (2d Cir. 1991).

■ Pels argues that this action was commenced under the federal proxy laws and is thus ruled by federal law. Under federal law, a demand is absolutely required as per Fed.R.Civ.P. 23.1. According to Pels, therefore, because Katz failed to make or allege having made the requisite and absolute demand on the LIN Board prior to commencing this action, that constitutes a fatal defect in the Amended Complaint warranting dismissal. I disagree. The Supreme Court has since overturned the Seventh Circuit, stating that the appeals court "erred by fashioning a uniform federal common law rule abolishing the futility exception in derivative actions." *Kamen v. Kemper Financial Services, Inc.,* — U.S. —, —, 111 S.Ct. 1711, 1723, 114 L.Ed.2d 152 (1991). Because the Supreme Court rejected the notion of a "universal demand rule," the fact that Katz failed to make a demand on the Board prior to commencing this action is not dispositive.

Until just recently, there has been no decision controlling whether, in an action concerning mixed questions of federal and state law, federal or state law abides to govern demand requirements in corporate litigation.

> We have never decided whether state or federal law supplies the rule of decision under Fed.R.Civ.P. 23.1 regarding the adequacy of a derivative plaintiff's efforts to secure director action, or whether the source of that rule of decision turns on the underlying claim being state or federal ... The demand requirement is thus determined by one's view of the role and power of directors with respect to derivative litigation, qualified in the case of federal claims only by the need to ensure that particular federal policy at issue is not frustrated.

*RCM Securities Find, Inc. v. Stanton,* 928 F.2d 1318, 1325 (2d Cir.1991).

> "Where a state claim is involved, therefore, the source of the demand requirement must be the law of the state of incorporation. Nothing in Rule 23.1 suggests otherwise." *Id.* at 1327. "Judicial review of a corporate decision to bring, not to bring, or to terminate a lawsuit is in turn governed by the state of incorporation." *Id.* at 1326 (citing *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)). Delaware is the state of LIN's incorporation and thus Delaware law appears applicable to the case at bar. *"The law of that state applies even where federal claims are involved."* *Id.* (emphasis supplied). This is so because the demand requirement and the state's business judgment rule are inextricably bound. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984) ("Inextricably bound to threshold questions of demand futility are issues of business judgment, and the standards by which director action is measured.") Thus, Pels wholly fails to show why the "universal demand rule" is applicable to this case.

■ Katz concedes that pendent state claims for corporate waste are considered derivative. As such derivative claims in the complaint are subject to Chancery Court Rule 23.1, which requires the plaintiff to allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority. Under that rule, however, a demand on the Board is vitiated upon plaintiff's showing that making such a demand would be futile under the circumstances. *See Aronson v. Lewis,* 473 A.2d 805, 811–12 (Del.1984). Thus, Katz must demonstrate that a majority of the current LIN Board could not impartially assess the validity of the complaint. *Haber v. Bell,* 465 A.2d 353, 358 (Del.Ch.1983). Conclusory allegations of bias or self-interest and,

therefore, of the futility of making demand will not suffice. *See id.; Grobow v. Perot,* 526 A.2d 914, 924, *aff'd,* 539 A.2d 180 (Del. Ch.1987). To establish that demand would be futile, the factual allegations of the complaint must "create a reasonable doubt that a majority of the directors were disinterested" on the issue whether or not the suit should be brought. *Siegman v. Tri–Star Pictures, Inc.,* 15 Del.J.Corp.Law 218, 239, 1989 WL 48746, 1989 Del.Ch. LEXIS 56 (Del.Ch. May 30, 1989). The requirement is premised on the reasonable expectation that the directors of a corporation are uniquely suited to judge the corporation's best interests and to litigate on its behalf, as well as to forestall "meritless actions brought solely for their settlement or harassment value." *Lewis v. Graves,* 701 F.2d 245, 247–48 (2d Cir.1983).

■ In this case, Pels avers that bias and self-interest are speculative at best for not one of LIN's current directors was the holder of a LIN option at the time of the vote or at any other time before or after the "Change in Control." I disagree. The six dual directors constituting a majority of the LIN Board, owed McCaw and its shareholders a fiduciary duty to refrain from taking any actions which would not be in the best interests of McCaw. Thus, such directors cannot fairly consider a demand to bring a suit on behalf of LIN which, if brought, could be directly adverse to the financial interests of McCaw. There is more than a reasonable doubt that the LIN directors were bound in their loyalties to McCaw to adequately protect LIN shareholder interests. *See Siegman v. Tri–Star Pictures, Inc.,* 15 Del.J.Corp.Law 218, 239, 1989 WL 48746, 1989 Del.Ch. LEXIS 56 (Del.Ch. May 30, 1989). (To establish that demand would be futile, the factual allegations of the complaint must "create a reasonable doubt that a majority of [the] directors were disinterested" as to whether or not the suit should be brought). As such, it has been amply demonstrated to that making a demand on the LIN Board would have been no more than a futile effort.

### III. *State Claim*

■ Katz asserts that Pels committed corporate waste by authorizing pay-

ments to the insiders in excess of the "highest price" paid to the public stockholders in the McCaw Partial Offer. Amended Complaint ¶¶ 34–38. While corporate directors are given a considerable amount of latitude in interpreting corporate provisions, such as in this case the stock option plans, that latitude is not without limit. *Aronson v. Lewis,* 473 A.2d 805 (Del.1984). In the derivative context, plaintiffs may maintain an action for corporate waste if they can show that the directors' action could not have resulted from the reasonable exercise of business judgment. Here, Katz alleges that any payments made to insiders in excess of those paid to the public shareholders could not have resulted from any reasonable interpretation of the Highest Price Provision. Whether Katz will be able to prove this proposition is a factual question which cannot properly be resolved on a motion to dismiss.

For the foregoing reasons, Pels' motion to dismiss the complaint is denied in all respects.

SO ORDERED.