Nora VIDES and Ruby
Resnik, Plaintiffs,

v.

Gilbert F. AMELIO, Clarence C. Barksdale, James E. Barnes, August A. Busch III, William P. Clark, Martin K. Eby Jr., Herman E. Gallegos, Jess T. Hay, James A. Henderson, Bobby R. Inman, Charles F. Knight, Lynn M. Martin, John B. McCoy, Mary S. Metz, Toni Rembe, S. Donley Ritchey, Joyce M. Roché, Carlos Slim Helú, Laura D'Andrea Tyson, Patricia P. Upton, Edward E. Whitacre, Jr, and SBC Communications, Inc., Defendants.

No. 02 Civ. 6149(LLS).

United States District Court,
S.D. New York.

May 28, 2003.

Ballon Stoll Bader & Nadler, P.C., New York City (A. Arnold Gershon, of counsel), for plaintiffs.

Sullivan & Cromwell, New York City (John L. Warden, Sharon L. Nelles, Michael S. Winograd, of counsel), for defendants.

**Opinion and Order**

STANTON, District Judge.

Defendants SBC Communications, Inc. ("SBC") and its individual directors move pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) to dismiss the complaint in this shareholders' derivative action. The complaint asserts a federal claim of distribution of a false and misleading proxy solicitation for SBC's 2002 Annual Meeting, in violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and cognate Rule 14a–9, 17 C.F.R. § 240.14a–9, and a state law claim of breach of fiduciary duties by awarding excessive compensation to SBC's directors and to Edward E. Whitacre, Jr., a director and SBC's Chief Executive Officer.

Defendants seek dismissal of the complaint for failure to make a pre-suit demand on the Board, and for failure to state a claim upon which relief may be granted.

The factual allegations in the complaint are accepted as true and all reasonable inferences from the facts are drawn in the plaintiffs' favor. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995).

A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* Merely conclusory assertions, however, will not suffice to defeat a motion to dismiss, and the proxy statement (and other documents integral to plaintiffs' claims) may be considered in connection with the motion. *Faulkner v. Verizon Communications, Inc.,* 189 F.Supp.2d 161, 168 (S.D.N.Y.2002).

**Federal Claim for False or Misleading Proxy Statement**

**A. Demand**

■ The purpose of requiring a demand upon the board of directors before proceeding with derivative litigation is to obtain the business judgment of the board on whether the litigation is in the best interests of the corporation and its shareholders. The requirement is appropriate, for example, where the litigation involves a transaction presenting questions of business judgment, where a court should be reluctant to substitute its judgment for that of the corporation's legitimate management.

■ That purpose has little bearing on a claim that a proxy statement makes a false assertion or an insufficient disclosure. Such questions are normally determined without particular need for business judgment, and the courts decide them as a matter of course. Whether a proxy statement properly omitted an item is regarded as a question of materiality, not one protected by the business judgment rule. Thus, in *In re Tri–Star Pictures, Inc. Litig.,* Civ. No. 9477, 1990 WL 82734, at *8 (Del.Ch. June 14, 1990), the Delaware Chancery Court stated that subjecting proxy disclosure claims to a demand requirement

would be inconsistent with Delaware case law holding that the business judgment rule does not apply to '... the question whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made....'

In *In re Anderson, Clayton Shareholders' Litigation,* 519 A.2d 669, 675 (Del.Ch. 1986), the Delaware Court of Chancery stated:

First, and most importantly, the question whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made, is not a decision concerning the management of business and affairs of the enterprise (8 Del. C. § 141(a)) of the kind the business judgment rule is intended to protect; it is rather a matter relating to the directors' duty to shareholders who are technically outside of the corporation....

Less technically, decisions dealing with the quality of, and the circumstances surrounding, disclosures are not inherently of the kind which courts are ill suited to treat on their merits.

Federal courts in this circuit apply the Delaware law. *See Katz v. Pels,* 774 F.Supp. 121, 127 & n. 5 (S.D.N.Y.1991); *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 150 n. 18 (S.D.N.Y.1989) ("Plaintiffs correctly contend that the business judgment rule does not apply to allegations regarding misrepresentations or omissions in a proxy statement," citing *In re Anderson.*)

In *Galef v. J.A. Alexander*, 615 F.2d 51, 63–64 (2d Cir.1980), the Second Circuit stated:

> The role of management in educating the stockholder sufficiently to allow him to cast an intelligent vote is unique. Those managing the corporation have the greatest access to relevant factual information. They have most clearly in mind the corporation's long-range plans. These factors and the directors' status as fiduciaries usually cause stockholders to give statements from management greater weight than they accord to the statements of corporate dissidents. Obviously the goal of § 14(a) that communications from management be accurate and complete as to all material facts is a vital one. Its achievement would be quite clearly frustrated if a director who was made a defendant in a derivative action for providing inadequate information in connection with a proxy solicitation were permitted to cause the dismissal of that action simply on the basis of his judgment that its pursuit was not in the best interests of the corporation. The very premises which give life to a derivative right of action to enforce § 14(a) must save it from a premature death. In short, we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors.

Thus, under Delaware law and federal policy, there is no need for prior demand upon the board of directors with respect to the claim of misstatements and omissions in the proxy statement.

## B. Merits of the Claim under Section 14(a)

The elements of a Section 14(a), Rule 14a–9, claim are:

> (1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action.

*Halpern v. Armstrong*, 491 F.Supp. 365, 378 (S.D.N.Y.1980) (citation omitted).

Federal regulations governing the solicitation of proxies provide that "if action is to be taken with regard to the election of directors," the proxy statement must furnish information about the compensation of directors and executive officers. *See* 17 C.F.R. § 240.14a–101, Schedule 14A, Items 7 and 8 (Item 8 refers to information required by Item 402 of Regulation S–K, 17 C.F.R. § 229.402).

The alleged omissions and false or misleading statements fall into general categories relating to: (1) incentive compensation paid to Whitacre, (2) director compensation, (3) tax consequences to SBC of incentive compensation, and (4) alleged deviation from a representation made in 1996 about the termination of an earlier incentive compensation plan.

### (1) Whitacre's Compensation.

Generally, the "omission of information from a proxy statement will violate [section 14(a) and Rule 14a–9] if either the SEC requirements specifically require disclosure of the omitted information in a proxy statement, *or* the omission makes

statements in the proxy statement materially false or misleading." *Resnik v. Swartz,* 303 F.3d 147, 151 (2d Cir.2002) (emphasis in original).

The Securities and Exchange Commission regulations require disclosure of the "factors and criteria upon which the CEO's compensation was based," as well as a "specific discussion," "describing each measure of the registrant's performance, whether qualitative or quantitative, on which the CEO's compensation was based." Item 402(k)(2) of Regulation S-K, 17 C.F.R. § 229.402(k)(2) states:

(2) Discussion is required of the compensation committee's bases for the CEO's compensation reported for the last completed fiscal year, including the factors and criteria upon which the CEO's compensation was based. The committee shall include a specific discussion of the relationship of the registrant's performance to the CEO's compensation for the last completed fiscal year, describing each measure of the registrant's performance, whether qualitative or quantitative, on which the CEO's compensation was based.

■ The proxy statement devotes four pages to Executive Compensation, setting forth the objectives, policy ("that annual base salaries for officers will be market-based"), incentives (including adjustments for achievement of less than target objectives), and a separate section describing compensation for the chief executive officer, as follows:

The Committee's principal objective in establishing compensation policies is to develop and administer a comprehensive program designed to attract and retain outstanding managers who will enhance the profitability of SBC and create value for our shareowners. The policies are designed to attract and retain high-quality executives, to encourage them to make career commitments to SBC and to accomplish SBC's short and long term objectives. To achieve these results, the Committee, in consultation with a nationally recognized compensation and benefits consulting firm, has developed a compensation program that combines annual base salaries with annual and long term incentives principally tied to the performance of SBC and SBC's common stock. The principles used by the Committee in developing the program include the following:

● To align the financial interest of SBC's executives with those of SBC and its shareowners, a significant portion of executive compensation should be 'at risk' and tied to the achievement of certain short and long term performance objectives of SBC.

● Ownership of SBC's common stock by executives should be encouraged through SBC's compensation program.

● Sustained superior performance by individual officers that enhances the profitability of SBC should be recognized and appropriately rewarded. As measured by the Committee, such performance may include increasing revenues, reducing expenses, efficiently deploying capital, developing management, and improving service and product quality, while always complying with the high ethical standards established by SBC for the conduct of its officers and employees.

The Committee is responsible for approving the compensation of officers of SBC, including the Named Officers (defined on page 24), and certain officers of subsidiaries. The following is a summary of the policies underlying compensation reported for 2001.

*Annual Base Salary*–The Committee has established a policy that annual base salaries for officers will be market-based. The Committee determined in 2001 that salaries should relate reasonably to salaries for similar positions in the 50th to 75th percentile of companies similar in size and complexity. In making this comparison, the Committee used a group of companies in the telecommunications business, as well as a group of successful companies in diverse businesses (each a 'Comparator Group'). In each case, the Comparator Group was developed in consultation with the Committee's outside compensation consultant.

*Incentives*–To create incentives for superior efforts on behalf of SBC and to allow employees to share in the very success for which they are responsible, the Committee has determined that a significant portion of each officer's total compensation shall be dependent upon the annual and long term performance of SBC.

**Annual Incentives.** During 2001, officers and other key executives of SBC and certain subsidiaries received annual incentives under either the Short Term Incentive Plan or the 1996 Stock and Incentive Plan. The latter plan allows certain compensation paid to Named Officers to be deductible under Section 162(m) of the Internal Revenue Code (discussed below). Under each plan, the Committee awards an annual bonus contingent upon the yearly performance of the SBC business to which the officer is assigned.

Under each plan, a target award for each officer and the specific performance objectives applicable to the officer are established at the beginning of the year. If performance objectives are achieved and the target awards paid, the resulting awards typically would place the total of the respective officer's annual salary and short term award between the 50th and 75th percentile of the Comparator Groups. If less than the financial objectives are achieved, the target awards may be forfeited or, at a minimum, reduced in increasing proportions. In each case, the payment of any part of the award is at the discretion of the Committee. The 2001 financial targets for the Chief Executive Officer and certain other executive officers were based on the net income of SBC; targets for other executive officers were based on earnings before interest, taxes, depreciation and amortization of a division or business or earnings on international investments. The Committee reviewed the performance objectives and corresponding results for 2001 and determined that as a result of general economic conditions, the internal targets set at the beginning of the year by the Committee for the executive officers, including all of the Named Officers, had not been attained (except for one non-Named Officer). The Committee notes, however, that notwithstanding the unfavorable economic and regulatory environment, SBC nonetheless achieved commendable financial results in 2001. In recognition of this performance, the Committee paid discretionary awards with respect to the year 2001 to most participants in the 1996 Stock and Incentive Plan, including all of the Named Officers. These discretionary awards were significantly below the targets for the respective participants.

**Long Term Incentives.** Since its inception, SBC has provided stock-

based long term incentives to officers and other key executives of SBC and certain subsidiaries in the form of performance shares and stock options.

Performance shares are designed to tie the executive's financial interests to those of our shareowners through the establishment of long term performance awards and the payment of awards in common stock and/or in cash based upon the price of common stock. Performance shares are granted under the 1996 Stock and Incentive Plan or its successor, the 2001 Incentive Plan, which was approved by shareowners last year. Performance shares are designed to encourage employees to focus on exceeding a specified level of return. Each officer, including each of the Named Officers, is granted a specific number of performance shares, each equivalent in value to a share of common stock. At the end of the performance period, a percentage of the performance shares, not to exceed 100% of the performance shares granted (up to 200% for awards granted in 2001 and later), is paid out (i.e., converted into common stock and/or cash), based on the annual achievement of SBC's financial goals averaged over a three-year period. (Occasionally one- or two-year periods are used.) The Committee used value-added goals (after-tax cash operating profit less depreciation and less capital charge) in 1998, and began using net income goals in 1999. (If SBC fails to achieve certain minimum financial targets, no award may be paid). The Committee also recognizes the importance of stock options as a means to further tie the executive's financial interests directly to those of our shareowners. During 2001, the Committee granted stock options to managers at all levels, including all of the Named Officers. The target value of the regular long term grants (combined value of the target performance shares and stock options) made in 2001 was designed to relate reasonably to the value of all long term type awards made to the 50th to 75th percentile of employees holding similar positions with companies in the relevant Comparator Groups. The Chief Executive Officer was targeted to the 75th percentile of the Comparator Groups. As a result of a reduction in the workforce, SBC was calling on its managers to exert additional efforts towards SBC's success. To send a positive message to SBC's managers, the Committee decided to make an additional grant of options in November generally similar in size to the January grant. Because of the option grant made to Mr. Whitacre in conjunction with his employment agreement (described under 'Contracts with Management,' page 29), Mr. Whitacre did not participate in this additional grant.

In 2001, SBC's officers received the payout of their performance share awards for the 1998–2000 and, if applicable, 1999–2000 performance periods. The Committee determined that during these performance cycles, SBC exceeded the performance goals set by the Committee. In accordance with a predetermined formula, 100% of the target performance shares granted to the officers were distributed.

SBC also provides several alternatives for its managers to invest a portion of their salaries and annual incentive awards in SBC common stock, thereby giving these managers an even greater stake in the performance of SBC. One such opportunity is the Stock Savings Plan, under which a

middle level or above manager may receive stock options based upon the number of shares purchased by the manager under the program through payroll deductions.

**_Compensation for the Chief Executive Officer_**–The foregoing principles and policies were applied by the Committee in determining the compensation for the Chairman of the Board and Chief Executive Officer, Mr. Whitacre, for the last fiscal year. The Committee targeted Mr. Whitacre's 2001 annual salary and target bonus to the 75th percentile paid by companies in the Comparator Groups. Mr. Whitacre's total cash compensation in 2001 reflects the Committee's view of Mr. Whitacre as one of the leading Chief Executive Officers in the United States. Again in 2001, he and his skilled employee team produced solid financial results under extraordinarily challenging economic and regulatory conditions. As a result of Mr. Whitacre's leadership, SBC ended 2001 with the strongest balance sheet, cash flows and credit ratings in the telecommunications industry. Mr. Whitacre, along with other Named Officers, received stock options and performance shares, as described above under 'Long Term Incentives.'

(proxy statement at 20–23.)

That discussion was followed by a table setting forth the annual and long-term compensation of Whitacre and four other principal officers (in components of salary, bonus, other annual compensation, restricted stock awards, number of securities underlying options, LTIP payouts and all

other compensation) for each of the years 1999–2001.

That presentation adequately complies with the regulations' requirement. Indeed, plaintiffs do not primarily urge that it does not: paragraph 27 of the complaint admits that "the allegations in the preceding paragraphs are drawn from the proxy statement" itself. Their fundamental claim is rather that the presentation is "in such an intricate and confusing manner that it is incomprehensible to the Company's stockholders," a claim which the above-quoted material, which is carefully written but not incomprehensible, belies. After all, "corporations are not required to address their stockholders as if they were children in kindergarten." *Wallerstein v. Primerica Corp.*, 701 F.Supp. 393, 398 (E.D.N.Y.1988).

### (2) Directors' compensation

█ The complaint alleges that the disclosure of directors' compensation is confusing and therefore uninformative (compl.¶ 27), and that it would lead a stockholder to believe directors earn $60,000 when in actuality they earn at least $100,000 over that amount (compl.¶ 29).

The proxy statement, however, discloses information that permits any shareholder to calculate amounts awarded to directors. It clearly states that directors receive, in addition to their $60,000 annual retainers, annual awards of stock units "equal in value to one and one-half times the annual retainer," as well as a number of stock units equal in value to $13,000. (proxy statement at 13.) The regulations do not require that the proxy compute the total figure awarded directors.[1]

---

**1.** The regulations provide: "Describe any standard arrangements, stating amounts, pursuant to which directors of the registrant are compensated for any services provided as a director, including additional amounts payable for committee participation or special assignments." 17 C.F.R. § 229.402(g)(1). Any other arrangements require more specifics, i.e., a description, a statement of the

The complaint also alleges that the proxy statement fails to disclose that the directors determine and vote for their own compensation (compl.¶ 30), and that director compensation has increased at a greater rate than the Company's earnings and stock price, such that director pay has tripled since 1998, while the stock price rose only five percent, and earnings declined (compl.¶ 31). (*See generally id.* at ¶¶ 26–32.)

The regulations do not require disclosure of the fact that directors determine and vote for their own compensation. "Director compensation, fixed by the board, is contemplated by Section 141(h) of the Delaware General Corporation Law." *Steiner v. Meyerson,* Civ. No. 13139, 1995 WL 441999, at *7 (Del.Ch. July 19, 1995). Nor do the regulations require disclosure of historical director compensation figures or comparisons of director compensation with earnings or stock price trends. That information is "not required to make other information presented in the proxy statement not materially false or misleading." *Cf. Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir.2002).

### (3) Tax consequences of incentive compensation

█ Defendants argue that they are not required by federal regulations to make any disclosures regarding the tax consequences of the Board's decisions regarding executive and director compensation, and that the proxy statement nevertheless adequately discloses that "not all performance and incentive compensation is necessarily subject to favorable tax treatment." (Defs.' Mem. at 19.)

While the SEC regulations do not require disclosure of the tax consequences of compensation decisions, in 1993 the SEC issued an interpretive release saying that the discussion of compensation policies should address relevant tax exemption policies:

Finally questions have been raised as to the need for the Compensation Committee Report to address the deductibility of executive compensation under the new provisions of the Internal Revenue Code. The report should in its discussion of executive compensation policies address the registrant's policy with respect to qualifying compensation paid to its executive officers for deductibility under Section 162(m) of the Internal Revenue Code.

Sec. Act Release No. 7032, Exch. Act Release No. 33229 (Nov. 22, 1993), 55 S.E.C. Docket 1352, 1993 WL 483132, at *4.

The Committee's tax policy is adequately disclosed in the proxy statement in a paragraph entitled, "Limit on Deductibility of Certain Compensation":

Federal income tax law prohibits publicly held companies, such as SBC, from deducting certain compensation paid to a Named Officer that exceeds one million dollars during the tax year. To the extent that compensation is based upon the attainment of performance goals set by the Committee pursuant to plans approved by the shareholders, the compensation is not included in the computation of the limit. Although the Committee intends, to the extent feasible and where it believes it is in the best interests of SBC and its shareowners, to attempt to qualify executive compensation as tax deductible, it does not intend to permit this arbitrary tax provision to distort the Committee's development and execution of effective compensation plans. Thus, the Committee will continue to exercise discretion in

amount paid, and the name of the director. *See* § 229.402(g)(2).

those instances where the mechanistic approaches necessary under tax law considerations could compromise the interests of the shareholders.

(proxy statement at 23.)

Plaintiffs allege that the proxy statement does not identify what compensation qualifies as performance-based (in particular, the "Special Performance and Retention Awards"), and does not otherwise disclose the tax costs to the corporation of the Board's compensation decisions. (compl.¶¶ 18–21.) Those matters, reflecting specific costs, are not required to be disclosed, and their omission does not make the statement of the policy false and misleading.

**(4) Omission of earlier statement about termination of an incentive compensation plan.**

■ The complaint alleges that the proxy statement fails to disclose that the payment of awards pursuant to the "Short Term Incentive Plan" plan breaks a promise, made in the 1996 proxy statement, that SBC would no longer make payments under the Key Executive Officer Short Term Incentive Plan if shareholders approved the 1996 Stock and Incentive Plan. The complaint implies, but does not allege, that the two incentive plans, the "Key Executive Officer Short Term Incentive Plan" and the "Short Term Incentive Plan," are the same: it claims a "subtle change of name." (compl.¶ 22.)

Whatever the relationship between the Key Executive Short Term Incentive Plan and the Short Term Incentive Plan, the 2002 proxy statement discloses the corporation's present conduct. Omitting earlier proxy statements about an earlier plan does not render the description of the present payments misleading.

For the foregoing reasons, plaintiffs' federal claim upon the proxy statement fails, and must be dismissed.

**State Law Claim for Excessive Payments to Whitacre and Directors**

In light of the dismissal of the first claim, there is no independent federal jurisdiction over plaintiffs' state law claim (there being no claim of diversity jurisdiction), and pendent jurisdiction should not be exercised. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Eatz v. DME Unit of Local Union No. 3,* 973 F.2d 64, 67 (2d Cir.1992).

*Conclusion*

There is no need to make a demand upon the board of directors before litigation of the federal proxy statement claim, but it fails to state a claim upon which relief may be granted, and is dismissed. For lack of an independent basis of federal jurisdiction, the state law claim of excessive compensation is also dismissed.

The Clerk will dismiss the complaint, with costs and disbursements to defendants according to law.

So ordered.