**UNITED PAPERWORKERS INTERNATIONAL UNION,**
**Plaintiff,**

v.

**INTERNATIONAL PAPER COMPANY,**
**Defendant.**

**No. 92 Civ. 2941 (CLB).**

United States District Court,
S.D. New York.

Aug. 17, 1992.

</div>

Richard McCracken, Davis Cowell & Bowe, San Francisco, Cal., Bruce Simon, Cohen Weiss & Simon, New York City, for plaintiff.

Henry King, Gary G. Lynch, Lisa L. Lang, Davis, Polk & Wardwell, New York City, for defendant.

## MEMORANDUM DECISION

BRIEANT, Chief Judge.

By motions fully submitted on June 4, 1992, plaintiff United Paperworkers International Union and defendant International Paper Company ("the Company") each have moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). Jurisdiction is based on the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (Supp.1992), and on 28 U.S.C. § 1331 (Supp.1992). There is no genuine disputed issue of material fact.

On April 23, 1992, plaintiff brought an Order To Show Cause and a Temporary Restraining Order, seeking to enjoin further solicitation and voting of proxies in connection with defendant International Paper's Annual Meeting. That meeting was scheduled to take place on May 12, 1992. Specifically, the plaintiff alleged that the defendant's Board of Directors, in response to a shareholders' proposal, authorized and included in its proxy materials

a statement which contained false and misleading representations, intended to procure the defeat of the proposal, as well as material omissions. Though the plaintiff was not a sponsor of the shareholders' proposal, it was and is the beneficial owner of twenty-five shares of International Paper's stock.

After a conference with counsel, this Court, sitting in Part I in Foley Square, signed a Consent Order withdrawing the proposed Order to Show Cause. The Order to Show Cause was withdrawn because it appeared that, under Local Rule 21, the case should have been assigned to White Plains. Plaintiff then refiled in White Plains, and the case was assigned by random selection to this Court. On May 5, 1992, the Court held an expedited hearing on the plaintiff's motion for a preliminary injunction, pursuant to Fed.R.Civ.P. 65(a). The Court denied the motion for a preliminary injunction at that time. Essentially, the Court concluded that the plaintiff had raised colorable claims, but that the balance of equities weighed heavily in favor of the defendant, primarily because of the disruption of the Company's Annual Meeting attendant to the entry of an injunction.

After directing the parties to notify the sponsors of the shareholders' proposal of the pendency of this action, the Court, with the consent of counsel, converted the motion into cross-motions for summary judgment. The following represent the Court's statement of material facts and conclusions of law.

Defendant International Paper is a New York corporation whose shares are publicly traded on the New York Stock Exchange.[1] On March 31, 1992, the Company sent its shareholders a Notice of Annual Meeting and a Proxy Statement. Included in the proxy materials was a "Shareholder Proposal Concerning the Valdez Principles". This proposal, denominated as Item No. 6,

had been submitted to the Company by the Presbyterian Church (USA) pursuant to Rule 14a–8 of the Securities Exchange Act of 1934. 17 C.F.R. § 240.14a–8 (1992).[2] This rule was promulgated by the Securities and Exchange Commission under its rulemaking authority, 15 U.S.C. § 78n(a) (1981). It permits shareholders who have owned either 1% of the Company's equity securities or $1,000 worth of its stock for a specified period of time to submit proposals for a vote of the Company's shareholders. 17 C.F.R. § 240.14a–8(a)(1) (1992).

> The text of proposal # 6 was as follows:
> "RESOLVED, that the shareholders request our company to:
> 1. sign and implement the Valdez Principles; and
> 2. engage with shareholders, CERES, and affected communities in a continuing process to achieve a genuine and publicly trusted measure of public environmental accountability". Ex. A to April 27 Agee Affidavit at 20.

The sponsors of this proposal also appended a statement in support of their resolution. The statement outlines the Valdez Principles,[3] which were developed by CERES,[4] and recommends *inter alia* that the Company report its compliance with these principles to the CERES group.

Applicable regulations, specifically 17 C.F.R. § 240.14a–8(e), permit the Company's Board of Directors to offer a written response to such shareholder proposals. Thus, immediately following the sponsors' statement in support of Item No. 6 is a statement describing the position of the Company's Board on this proposal. That statement, which is the focal point of this litigation, states in full:

> "Position of the Company's Board of Directors"
> "Your Board of Directors recommends that the shareholders vote AGAINST the

---

**1.** In fact, International Paper is one of the thirty stocks which comprise the Dow Jones Industrial Average.

**2.** The proposal was co-sponsored by the Sisters of Saint Dominic, a Roman Catholic Order.

**3.** The "Valdez Principles" are reprinted in full as Appendix A to this Memorandum Decision.

**4.** "CERES" is an acronym for the Coalition for Environmentally Responsible Economies, a public interest group.

proposal for the reasons set forth below:"

"The Board, at the recommendation of Company management, has adopted a comprehensive statement of Environmental, Health and Safety Principles and implementing guidelines (set forth in Appendix B). This statement of Principles is the most recent articulation of the Company's longstanding commitment to the protection of the environment, which has been an explicit Company policy for many years. We believe that the Company's environmental conduct code in fact is both more stringent and more industry specific than the Valdez Principles. In the areas of waste disposal, air emissions and groundwater, the Company has invested hundreds of millions of dollars ($110 million in 1991 alone) in technology, equipment, facilities and personnel to be at the forefront in the enhancement and protection of the environment. An environmental staff was formed by the Company many years ago to maintain compliance with environmental laws and regulations as well as Company policy. The Company regularly audits each operating unit for compliance with the letter and spirit of those rules. A committee of the Board, the Environment, Health & Technology Committee, meets regularly to review environmental, safety and health policies and programs throughout the Company, and advise the Board of the effectiveness of these policies and programs."

"The Board believes the Valdez principles, though well-intentioned, are in many respects ambiguous and certain of them may not be applicable to the Company. The Board does not believe, for example, that the Company and its shareholders should be burdened with duplicative independent audit requirements and costs associated with additional reports, as called for by the Principles. Moreover, the Board believes that the Principles calling as they do for the selection of one director "qualified to represent environmental interests" are inappropriate since there are many and varied interests which shareholders have that should be the concern of all directors. Finally, the Board believes that implementation of the proposal would not provide any greater environmental protection than now exists and could be significantly more costly."

"In summary, the Board believes that protection of the environment is critical to any business today, but that the environmental affairs of the Company and the interests of our shareholders are already being addressed in an appropriate and timely manner."

"Approval of Item No. 6 requires the affirmative vote of the holders of a majority of the shares voting on this proposal." Ex. A to April 27 Agee Affidavit at 22–23.

The "Statement of Principles" adopted by defendant and referred to in this text was annexed as Appendix B to the proxy materials. This statement is as follows:

"Environmental, Health and Safety Principles"

"Environmental stewardship has always been an important part of International Paper's business. The company has an obligation to the communities where it does business to ensure that its actions protect both the people who live there and the surrounding environment. While the company must obey all laws, it must also have a set of values that guides decision-making and actions".

"The principles are consistent with International Paper's longstanding policies on the environment, health and safety. Combined with a strong environmental compliance program, they serve as a challenge and mandate for every manager, supervisor and employee of International Paper:

* To make environmental, health and safety considerations priorities in operating existing facilities, as well as in planning new operations.

* To recognize, in developing and designing products to meet customer needs, the environmental, health and safety effects of product manufacture, distribution, use and disposal.

* To monitor its environmental, health and safety performance and to report regularly on these matters to the Board of Directors, as well as to confirm its adherence to these principles annually to the American Paper Institute.

* To train employees in their environmental, health and safety responsibilities, and to promote awareness and accountability on these matters.

* To improve environmental, health and safety performance through support of research and development that advance the frontiers of knowledge.

* To communicate with employees, customers, suppliers, the community, public officials and shareholders to build greater understanding on environmental, health and safety matters.

* To participate constructively in the development of public policies on environmental, health and safety matters.

* To continue to pursue energy conservation, increased energy efficiency, greater utilization of alternatives to fossil fuels and opportunities for cogeneration of electricity." Ex. A to April 27 Agee Affidavit at B–1.

Each of these principles is followed by "Implementing Guidelines". These guidelines are far too lengthy and long-winded to be reproduced here in full.[5] Their flavor is conveyed adequately by the following excerpts:

"International Paper is dedicated to safe and environmentally sound products, packaging and operations".

 \* \* \* \* \* \*

"International Paper recognizes the importance of operating in a manner that is safe for both mankind and the environment".

 \* \* \* \* \* \*

"International Paper will continue its decades-long involvement in supporting innovations and creativity in seeking solutions to environmental, health and safety concerns".

International Paper's Board had, as required by applicable regulations, submitted this response to proposal # 6 to the proposal's sponsors, the Presbyterian Church (USA) and the Sisters of Saint Dominic, for their review. Neither sponsor objected to it, so it was included in the proxy materials sent to all shareholders on March 31, 1992.

However, the plaintiff Union, which owns twenty-five shares of International Paper's stock, did object to the Board's response to the proposal. It contends that the statement contains false and misleading representations and omissions, in violation of both section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1981), and Rule 14a–9 of the Securities and Exchange Commission, 17 C.F.R. § 240.-14a–9 (1992).[6]

Specifically, the plaintiff claims that the following undisputed facts about the Company's environmental record belie the breezy assertions found in its response to the shareholder proposal:

* On July 3, 1991, the Company pled guilty to five felonies, relating both to violations of hazardous waste laws and falsification of required environmental reports, in the United States District Court for the District of Maine. The company agreed to pay a criminal fine of $2.2 million, the second largest fine ever assessed for violations of the hazardous waste laws.

* In February 1992, the Environmental Protection Agency initiated proceedings to debar International Paper from doing business with the federal government for a period of three years.

---

**5.** The "Implementing Guidelines" are annexed as Appendix B to this Memorandum Decision.

**6.** The relationship between the Union and the Company in recent years has apparently been rather more tense than is normally found in major industries. The role of defender of the environment fits poorly on the Union's shoul-

ders, and the Company is quick to note an undercurrent of malice in bringing and maintaining this action. The Court believes that the plaintiff's motives are not relevant to the issues to be resolved, though conceivably such matter might be considered in fashioning an equitable remedy.

* In April 1991, the Company settled a civil suit brought by the State of Maine and the Maine Board of Environmental Protection for violations of state environmental laws and regulations. In October 1991, the State returned to Superior Court in Maine to seek $700,000 in stipulated penalties for the Company's alleged failure to comply with this settlement. On April 21, 1992, a Superior Court judge assessed penalties against International Paper in the amount of $85,000.

* In 1990, the State of Missouri notified International Paper that it was preparing an enforcement action against the Company for violations of hazardous waste regulations at a Company facility in Joplin, Missouri. Settlement negotiations are proceeding in this dispute.

* On August 9, 1991, the Company entered into a consent decree with the State of New York. This settlement requires the Company to remedy air, water and soil pollution at a Company facility in Binghamton, New York.

* In December 1991, the EPA requested information from the Company relating to air pollution at a Company facility in Ukiah, California. The Company has stated that it anticipates the EPA will seek penalties in excess of $100,000 in this action.

* The Company has also stated that the EPA will likely seek penalties in excess of $100,000 in an anticipated action relating to 104 PCB facilitators in Longview, Washington.

* The Company is currently a party to approximately fifty administrative proceedings, brought under the Comprehensive Environmental Response, Compensation and Liability Act, which relate to the cleanup of hazardous wastes at commercial landfills.

* As of January 31, 1992, the Company is a defendant in 43 civil actions, involving 4,565 plaintiffs, relating to the pollution of three rivers in Mississippi. A co-defendant in two of these cases, the Georgia–Pacific Corporation, has already suffered substantial jury verdicts in similar actions.

The totality of this environmental record, the Union contends, renders false and misleading numerous statements in the Board's response to shareholder proposal # 6. It also contends that the Board's failure to mention these matters in its response to the proposal constituted omission of material facts, which is, of course, unlawful under the statute and rules promulgated thereunder.

■ Rule 14a–9, promulgated by the Securities and Exchange Commission pursuant to section 14(a) of the Securities Exchange Act of 1934,[7] states:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading". 17 C.F.R. § 240.14a–9 (1992).

In order to establish liability under this Rule, a plaintiff must establish 1) that the proxy materials contain a false or misleading statement of a material fact, or omit to state a material fact necessary in order to make the statement made not false or misleading; 2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and 3) that the proxy solicitation was an

---

7. Section 14(a) states in pertinent part:

"It shall be unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempt security) registered pursuant to section 781 of this title". 15 U.S.C. § 78n(a) (1981).

essential link in effecting the proposed corporate action. *E.g., Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1298–1301 (2d Cir.1973). A fact is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available". *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

However, as the Supreme Court has held in the related context of actions under Rule 10b–5, the federal securities laws do not reach ordinary instances of corporate mismanagement or breaches of fiduciary duty, leaving those issues to be resolved under applicable state laws. *Santa Fe Industries v. Green,* 430 U.S. 462, 476–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *Rodman v. Grant Foundation,* 608 F.2d 64, 70 (2d Cir.1979). A contrary holding would have allowed the SEC, with its numerous rules and regulations, to interfere unduly in the governance of state-chartered corporations—a serious affront to federalism the Court was not prepared to countenance. As Justice White, speaking for the Court in *Santa Fe,* stated:

> "... this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law. Federal courts applying a "federal fiduciary principle" under Rule 10b–5 could be expected to depart from state fiduciary standards at least to to the extent necessary to ensure uniformity within the federal system. Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden. As the Court stated in *Cort v. Ash, supra* [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)]: 'Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.' 422 U.S. at 84 [95 S.Ct. at 2091] (emphasis added)." *Santa Fe,* 430 U.S. at 479, 97 S.Ct. at 1304 (footnote omitted).

Our analysis of whether the defendant's Board made material misstatements or omissions must begin with the recent case of *Virginia Bankshares v. Sandberg,* —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). The *Bankshares* case involved a challenge by minority shareholders of the defendant Bank to representations made by the defendant's Board about the fairness of proposed merger. Rejecting the Board's arguments that misrepresentations about "soft" information were never actionable, the Supreme Court held that conclusory statements that the merger was "fair", or that it created a "high value", were actionable if the plaintiff could prove, as it had in *Bankshares,* that the Board knowingly offered false reasons in support of its conclusions: "Under § 14(a), then, a plaintiff is permitted to prove a specific statement of reason knowingly false or misleadingly incomplete, even when stated in conclusory terms". *Id.* at ——, 111 S.Ct. at 2759 (*per* Souter, J.). In this case, the plaintiff contends, International Paper's Board knowingly misrepresented the Company's environmental record, with the aim of defeating shareholder proposal # 6.

Defendant replies first that the Board's response to shareholder proposal # 6, even viewed in isolation, is not misleading. This argument is palpably without merit. Specific statements in both the Board's response to the proposal, such as the representation that the Company has "a longstanding commitment to the protection of the environment", and in the Company's "Environmental, Health and Safety Principles", such as the representation that the Company has "a strong environmental compliance program", are, to put it charitably, inconsistent with the serious and ongoing environmental challenges the Company has endured. *See Cooke v. Teleprompter Corp.,* 334 F.Supp. 467, 470 (S.D.N.Y.1971) (granting relief to plaintiff when proxy statement "incomplete, slanted and misleading").

Moreover, even if the Court could not identify specific statements that are at variance with the facts, the total impression conveyed by the Board's glib response to this proposal is that the Company is a model of environmental rectitude. Nowhere in any of these materials is there even a bare acknowledgment that the Company has had its share of difficulties in this area. As our Court of Appeals has held: "A proxy statement should honestly, openly and candidly state all the material facts.... Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all of one's cards on the table face-up". *Mendell v. Greenberg,* 927 F.2d 667, 670 (2d Cir. 1990), *corrected,* 938 F.2d 1528 (2d Cir. 1991). *See also Mills v. Electric Auto-Lite,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (section 14(a) intended to ensure "that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought' ") (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)).

More substantial is the defendant's argument that the Court should consider the Proxy Statement's accuracy in light of its Annual Report and media coverage of the Company's environmental difficulties. The defendant avers that details of its environmental record had been disclosed adequately in its Annual Report, which was mailed to all holders prior to the Annual Meeting, and that several articles and news reports had likewise focused attention on the Company's environmental record. Thus, in the defendant's view, its failure to mention in its Proxy Statement proceedings pending against it cannot, as a matter of law, constitute a material omission. *See Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978) (no duty to disclose information when plaintiff reasonably should have been aware of information due to massive contemporaneous publicity); *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 281 (2d Cir.1975) (defendant's "reasonable belief that the other party already has access to the facts should excuse him from new disclosures which reasonably appear

to be repetitive"); *Koplin v. Labe Federal Savings & Loan Assn.,* 748 F.Supp. 1336, 1342 (N.D.Ill.1990) ("Since the investment strategy information had already been disclosed [in a previous annual report], its inclusion in the 1990 proxy statement was not necessary"). *But see Wenzel v. Patrick Petroleum Co.,* 745 F.Supp. 211, 217–220 (D.Del.1990) (disclosures in prospectus, press releases and annual report insufficient to impute constructive knowledge to plaintiff); *Fisher v. Plessey Corp.,* 559 F.Supp. 442, 445–448 (S.D.N.Y.1983) (presence of information in public domain did not relieve defendant of duty to disclose); *Bertoglio v. Texas International Co.,* 488 F.Supp. 630, 642–44 (D.Del.1980) (same).

Furthermore, the defendant notes that shareholders concerned about environmental affairs could have consulted the Company's most recent Form 10–K, which did disclose fully all material facts regarding the Company's environmental record. *But see Bertoglio,* 488 F.Supp. at 643 (press release and Form 10–Q not type of information of which shareholders presumably aware).

■ Whether disclosure of material facts in other media satisfies the duty to disclose in a proxy statement depends on the facts of each particular case, and is subject to an "overriding principle" of "reasonableness". *Powell v. American Bank & Trust Co.,* 640 F.Supp. 1568, 1579 (N.D.Ind.1986). The proper analysis, this Court concludes, is that articulated in somewhat tortured fashion in the *Powell* case: "a public disclosure of information relieves the duty to disclose if it is reasonable to conclude that the plaintiff should have been made aware of the fact as a result of that disclosure". *Id.*

■ In this case, the Court holds as a matter of law that neither the Company's Form 10–K nor the press reports about International Paper's environmental record should be included as part of the "total mix" of information available to shareholders. The Form 10–K, though publicly available, is not mailed to shareholders, and, as the *Bertoglio* court noted, is not

information reasonably within the constructive knowledge of the typical security holder.

Likewise, though widespread press reports theoretically may put shareholders on constructive notice, the eight news articles cited by the Company, May 4 Defendant's Memorandum at 15 n. 4, span a period of over one year; the most recent article cited appeared some four months prior to the Annual Meeting. Furthermore, the only matters mentioned in these articles are the Company's guilty plea in District Court in Maine and the Mississippi dioxin litigation. This is hardly the type of thorough and intensive news reporting that is required for media coverage to be included in the "total mix" of information available to shareholders. *GAF Corp. v. Heyman*, 724 F.2d 727, 729 (2d Cir.1983) (proper to include media coverage in "total mix" when contest for corporate control generated "many news stories" and was "closely watched").

 Thus, the question that the Court must answer is whether the Proxy Statement and the Annual Report, the only items to which all shareholders manifestly had access, accurately portrayed the Company's environmental record. *Ash v. LFE Corp.*, 525 F.2d 215, 221 (3d Cir.1975) ("Fair accuracy, not perfection, is the appropriate standard" in judging truthfulness of proxy statement). Under all the circumstances, the Court believes that they did not, for the following reasons.

First, there is *no* mention in either the statement in opposition to proposal # 6 or in the annexed appendix of "Principles" of any of the recent or pending proceedings against the Company; nor is the relevant section of the Annual Report, which does discuss the Company's environmental record in a somewhat more balanced fashion, even referred to. *Cf. Goldsmith v. Rawl*, 755 F.Supp. 96, 96 (S.D.N.Y.1991) (defendant's failure to disclose in proxy materials litigation related to grounding of Exxon *Valdez* and formation of independent litiga-

tion committee actionable under section 14(a)).

Second, the Board's discussion of environmental issues in the Annual Report simply does not disclose information sufficient to enable a shareholder to make a reasoned judgment on whether proposal # 6 merits support. Thus, defendant's argument that the Annual Report "cures" any misstatements or omissions in the Proxy Statement must fail. *Bankshares,* — U.S. at —, 111 S.Ct. at 2760 ("Only when the inconsistency [between conflicting statements] would exhaust the misleading conclusion's capacity to influence the reasonable shareholder would a § 14(a) action fail on the element of materiality"). For example, though the Company's guilty plea in the District Court in Maine is mentioned, the fact that the crimes were felonies, two of which involved knowingly illegal conduct, is not disclosed. There is no mention of the pending EPA debarment action.[8] Beyond the bland statement that "International Paper is also a party to other environmental remedial actions under various federal and state laws", Ex. A to May 4 Wilderotter Affidavit at 36, there is no discussion of the actions initiated by the State of Maine and the State of Missouri, nor are the PCB enforcement action in Washington State and the fifty administrative proceedings under CERCLA disclosed.

Furthermore, even concerning those proceedings that *are* discussed, the Board's statement withholds critical facts from the shareholders. For instance, with respect to the State of New York's action against the Company, the Board stated that:

> "[T]he Imaging Products Division is currently conducting soil, groundwater and air testing at its Binghamton, New York, Anitec facility under a consent order with the State of New York to determine the extent of contamination and remedial action required due to accidental discharges. The Division's film base production process, which was a principal source of the environmental impact, was

---

8. Such EPA debarment, applied to other paper companies under Constitutional *requirements* of equal protection, might result in a Federal Government without paper, an outcome fervently *to* be wished.

shut down in 1991". Ex. A to May 4 Wilderotter Affidavit at ·36.

Undisclosed in this statement, as the plaintiff notes, are the facts that a) the tests alluded to were conducted only after the State of New York sought an injunction against the Company and b) as the Company did disclose in its Form 10–K, "It is expected that there will be additional orders and possible fines relating to environmental matters at that [Anitec] facility". Ex. B to May 4 Wilderotter Affidavit at 6. *Cf. Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 773 (3d Cir.1976) (summary judgment for securities law plaintiff proper when "reasonable minds could not differ" as to materiality of false statements).

The Court understands that many major American corporations which produce tangible goods have had serious environmental problems, and intends no criticism of the defendant in this regard. The Board was under no obligation to discuss its environmental record in responding to the shareholder proposal: it could simply have stated that it opposed the proposal, or that it opposed the proposal solely as a matter of corporate governance. *Cf. Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331–32 (S.D.N.Y.1979) (proxy regulations "simply do not require management to accuse itself of antisocial or illegal policies"), *vacated as moot*, 638 F.2d 7 (2d Cir.1980) (*per curiam*). However, since the Board chose to offer specific representations about the Company's environmental record and policies, it was obligated to portray that record fairly. *Bankshares*, —— U.S. at —— n. 7, 111 S.Ct. at 2761 n. 7 ("Once the proxy statement purported to disclose the factors considered ... there was an obligation to portray them accurately") (quoting *Berg v. First American Bankshares*, 796 F.2d 489, 496 (D.C.Cir.1986)); *Schlanger v. Four-Phase Systems, Inc.*, 582 F.Supp. 128, 132–33 (S.D.N.Y.1984); *Tanzer v. Haynie*, 405 F.Supp. 650, 654 (S.D.N.Y.1976) ("When

there is, as here, an affirmative representation by fiduciaries that they have determined a price to be fair and equitable, matters that might not otherwise have to be disclosed may require airing") (citation omitted). This it did not do.

■ Since we have concluded that the Board's response to shareholder proposal # 6 contained material misstatements and omissions, we must now· consider whether the Board acted with the requisite culpability. Regrettably, it is entirely unclear what degree of culpability is necessary for liability under Rule 14a–9. The Supreme Court in *Bankshares* expressly stated that: "In *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 444 n. 7, 96 S.Ct. 2126, 2130 n. 7, 48 L.Ed.2d 757 (1976), we reserved the question whether *scienter* was necessary for liability generally under § 14(a). We reserve it still". *Bankshares*, —— U.S. at —— n. 5, 111 S.Ct. at 2757 n. 5.[9] However, since the *Bankshares* plaintiff had in fact proved *scienter* at trial, the Court chose to "confine its discussion" to statements that were made knowingly, and indeed held that "... *knowingly* false statements of reasons may be actionable...." *Id.* at ——, 111 S.Ct. at 2755.

At least one Justice, though, interpreted the majority opinion as *not* "reserving" the question of whether *scienter* was necessary, at least in a "false statements of reasons" case:

"As I understand the Court's opinion, the statement 'In the opinion of the Directors, this is a high value for the shares' would produce liability if in fact it was not a high value and the Directors knew that. It would not produce liability if in fact it was not a high value but the Directors honestly believed otherwise". *Bankshares*, at ——, 111 S.Ct. at 2766 (Scalia, J., concurring in part and concurring in the judgment).

The Supreme Court's reluctance to say precisely what it means predictably has generated confusion in the lower courts. ("The reasoning in [*Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)] seems to compel a finding that *scienter* is not required in an action under the proxy rules").

9. The weight of scholarly commentary prior to *Bankshares* was that *scienter* is not required in a section 14(a) action. *E.g.,* Thomas L. Hazen, *Securities Regulation* § 13.4 at 458 (West 1985)

For example, one Court of Appeals has interpreted *Bankshares,* with Justice Scalia, as holding that a false statement of reason or belief is actionable only "where the statement is one that the directors who made it did not believe", that is, that in a "false statements of reasons" case, *scienter is* required. *Abrahamson v. Western Savings & Loan Association,* 951 F.2d 358 (Table), 1991 WL 266782, at *2, 1991 U.S.App.Lexis 29995, at *7 (9th Cir. December 12, 1991).

Other courts have interpreted *Bankshares* differently. In *In re Phlcorp,* 1992 WL 85013, 1992 U.S.Dist.Lexis 4777 (S.D.N.Y. April 10, 1992), Judge Leval of this Court stated that the question of whether "reckless, as opposed to knowing, misrepresentations of opinions, reasons or beliefs [are] potentially actionable under the rationale of *Virginia Bankshares"* was *"left undecided"* by the *Bankshares* Court. *Id.* at *16–*17. *But cf. IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980) ("reckless conduct will generally satisfy the *scienter* requirement" in action brought under Rule 10b–5).

Furthermore, one District Court, applying section 14(a) in a more traditional setting, relied on Second Circuit cases in stating that "[t]he plaintiff must show that the corporate issuer *negligently* drafted the proxy statement". *Parsons v. Jefferson– Pilot Corp.,* 789 F.Supp. 697, 703 (M.D.N.C.1992) (emphasis added) (citing *Wilson v. Great American Industries, Inc.,* 855 F.2d 987, 995 (2d Cir.1988)). *See also Gerstle,* 478 F.2d at 1301 n. 20 (negligence sufficient for liability under Rule 14a–9); *Katz v. Pels,* 774 F.Supp. 121, 126 (S.D.N.Y.1991) *(same). Thus, the elements* of a section 14(a) cause of action apparently depend on where the case is filed.

Even assuming a section 14(a) plaintiff must demonstrate *scienter,* the Court believes that this plaintiff has satisfied its burden of proof on this point. Defendant cannot argue with any rationality that the Board's response to the shareholder proposal was anything but a calculated attempt to mislead the shareholders and induce them to cast a negative vote. The

Board was presumptively and constructively aware of all relevant details of the Company's environmental record; rather than portraying that record accurately, or remaining silent, it chose instead to engage in flowery corporate happy-talk in order to defeat the proposal. The undisputed evidence compels a finding that the Board acted with the requisite knowledge and intent in making the misstatements and omissions detailed above. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984) (summary judgment appropriate in securities fraud case when "no reasonable inference supports the adverse party's claim").

▮ Defendant also claims that the third and final element for liability under Rule 14a–9—"transaction causation"—has not been established. Causation in a Rule 14a–9 case is an "elusive concept", *Securities Regulation, supra* n. 9, at 317, which was defined best by the Court in the *Mills* case. The Court there held that the "transaction causation" requirement is satisfied if the plaintiff demonstrates that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction". *Mills,* 396 U.S. at 385, 90 S.Ct. at 622.

The Supreme Court further considered the "transaction causation" requirement in *Bankshares.* In that case, the plaintiff, a minority shareholder, alleged that the majority shareholder, had made misrepresentations in its proxy materials. *Bankshares,* —— U.S. at ——, 111 S.Ct. at 2756. The plaintiff claimed causation even though the majority shareholder owned *sufficient shares to effect the transaction*— a freeze-out merger—irrespective of the *wishes or the votes of the rest of the* shareholders. *Id.* at ——, 111 S.Ct. at 2762. Essentially, the plaintiff contended that the "bad public relations" flowing from disapproval of the merger by the minority shareholders might have prevented the transaction. *Id.*

The *Bankshares* Court rejected this argument, reasoning that recognition of such a theory of causation would lead to "specu-

lative claims" and "procedural intractability". *Id.* at ——, 111 S.Ct. at 2765. However, the Court did not address the plaintiff's second theory of causation, namely that the misleading proxy solicitation had caused her to lose remedies granted her by state law. *Id.* ("This case does not … require us to decide whether § 14(a) provides a cause of action for lost state remedies …").

■ Based on these cases, the defendant contends that since this shareholder proposal was merely precatory, the Board legally could have ignored the proposal even had it passed. Therefore, the argument goes, plaintiff cannot demonstrate that the proxy solicitation itself was an "essential link" in accomplishing any transaction, or that the proxy solicitation was a source of the plaintiff's injury.

There is, however, a significant factual distinction between the *Bankshares* case and the case at bar. The *Bankshares* Court was applying the concept of "transaction causation" in the more common factual posture of Rule 14a–9 cases, e.g., where the challenged statements had been made by the Board to effect an *economic* transaction which it *supported*. *Bankshares*, —— U.S. at ——, 111 S.Ct. at 2763 ("… in which the solicitation links a *directors'* proposal with the votes legally required to authorize the action proposed") (emphasis added). In this case, however, the challenged portion of the proxy statement relates to a *policy* proposal for internal corporate governance which the Board *opposes*.

Courts deciding cases in this unusual factual posture have divided: some have held that "transaction causation" is lacking, while others have found that causation could be proved. *Compare Sisters of the Precious Blood, Inc. v. Bristol–Myers Co.*, 431 F.Supp. 385, 386 (S.D.N.Y.1977) (claim that corporation made false and misleading statements in response to precatory shareholder proposal failed due to absence of transaction causation) *with Trans World Corp. v. Odyssey Partners*, 561 F.Supp. 1315, 1322 (S.D.N.Y.1983) (alleged violations of section 14(a) relating to precatory shareholder proposal can provide basis for injunctive relief).

This Court believes that the strict rule of causation advocated by the defendant effectively would deny a shareholder plaintiff *any* remedy under Rule 14a–9 for misleading statements or omissions made by a Board in response to a shareholder proposal which has no direct economic effect. Shareholder proposals are, after all, almost always precatory, Patrick J. Ryan, *Rule 14a–8, Institutional Shareholder Proposals and Corporate Democracy*, 23 Ga. L.Rev. 97, 101 & 111 n. 53 (1988) (the "typical rule 14a–8 proposal … is advisory or precatory in nature"), and this particular proposal, which is phrased as a "request", is no different. Because a Board likely is not legally required to act on a "request",[10] even if the proposal passes, the shareholder plaintiff *never* will be able to demonstrate that the proxy solicitation itself was an "essential link" in the accomplishment or prevention of any "transaction"; that is, the nexus between the proxy solicitation process and an independent requirement, found in state law or corporate charter or by-law, that the underlying "transaction" be approved by a certain percentage of the shares eligible to vote, will always be lacking.

This Court believes that such a result— the effective denial of a federal statutory remedy to a shareholder plaintiff—would undermine the purposes of both the statute and the shareholder proposal rule, 17 C.F.R. § 240.14a–8 (1992). As the U.S. Court of Appeals for the District of Columbia Circuit has stated:

> "It is obvious to the point of banality to restate the proposition that Congress intended by its enactment of section 14 of the Securities Exchange Act of 1934 to give true vitality to the concept of corporate democracy". *Medical Committee for Human Rights v. SEC*, 432 F.2d 659,

---

**10.** In view of our disposition of the "transaction causation" issue, the Court need not speculate as to whether a plaintiff could state a claim for breach of fiduciary duty under applicable state law should a proposal pass and then be ignored by the Board.

676 (D.C.Cir.1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

Likewise, the Senate Committee Report on the Act emphasized the expansive remedial purpose of the statute:

"In order that the stockholder may have adequate knowledge as to the manner in which his interests are being served, it is essential that he be enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy which are decided at the stockholders' meetings". S.Rep. No. 792, 73d Cong., 2d Sess. 12 (1934).

Far from serving the expressed Congressional goal of "enlightening" the shareholder with respect to "major questions of policy", the effective foreclosure of a federal statutory remedy would permit the Board to distort the Company's record in its response to a shareholder proposal, and so defeat possibly meritorious proposals by half-truths and deception. *Cf. Mills,* 396 U.S. at 385, 90 S.Ct. at 622 (noting that Court was "... resolving doubts in favor of those the statute [the Securities Exchange Act] is designed to protect").

Such an interpretation would also create a disturbing anomaly in the law of securities regulation. Most courts, building on the Supreme Court's recognition of an implied right of action under section 14(a), *J.I. Case Co. v. Borak,* 377 U.S. 426, 430–31, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), have held that the proponent of a shareholder proposal has an implied right of action under Rule 14a–8; the proponent of such a proposal, therefore, may sue the Company if the Company wrongfully excludes its proposal from the ballot. *See, e.g., Rauchman v. Mobil Corp.,* 739 F.2d 205, 207–08 (6th Cir.1984); *New York City Employees' Retirement System v. American Brands, Inc.,* 634 F.Supp. 1382, 1386 (S.D.N.Y.1986). The U.S. Court of Appeals for the District of Columbia Circuit recently so held in an opinion which emphasized the important "informational rights" secured by Rule 14a–8. *Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 422 n. 10 (D.C.Cir.1992). It would be strange indeed if the proponent of a shareholder proposal could sue under Rule 14a–8 to compel the Company to place its proposal on the ballot, but could not then challenge under Rule 14a–9 material misstatements or omissions in the Company's response to its proposal, simply because as worded, it means nothing in terms of the governance of the corporation whether it passes or is defeated.

Nor is it any answer to contend that the limited administrative review provided by 17 C.F.R. § 240.14a–8(e) assures that such misstatements or omissions will not occur. That provision states that the proponent of a shareholder proposal may inform the SEC of any misstatements or omissions in the Board's response to the proposal. 17 C.F.R. § 240.14a–8(e) (1992). Such review, however, is entirely discretionary, and the right to seek such review is limited to the proponent of the resolution. Furthermore, the SEC's opinion as to the accuracy of the challenged proxy materials is neither binding nor entitled to any deference under *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). 17 C.F.R. § 240.-14a–9(b) (1992). *See Roosevelt,* 958 F.2d at 424 (noting SEC's view that "supplementary private enforcement" of Rule 14a–8 necessary). This informal review process, then, has not and will not deter the type of unlawful conduct revealed by this very case.

Accordingly, the Court holds that a Rule 14a–9 plaintiff challenging the accuracy of a Board's response to a shareholder proposal need only establish that the Board knowingly made misleading misstatements or omissions, and that such misstatements or omissions had a "significant *propensity* to affect the voting process". *Mills,* 396 U.S. at 384, 90 S.Ct. at 621.

Lastly, in a letter dated July 15, the defendant contends that the controversy is now moot. The letter was addressed to the Court in response to our inquiry with respect to the outcome of the vote on proposal # 6. The proposal received 5.937% of the votes cast at the Company's Annual Meeting. The Company has elected to

treat this vote as if it were the 6% required by the SEC for resubmission to the shareholders at the 1993 Annual Meeting. *See* 17 C.F.R. § 240.14a–8(c)(12)(ii) (1992). Thus, the Company argues, the only remedy the Court could fashion will now occur in the ordinary course.

The Court disagrees. First, the plaintiff is entitled to a judgment as to the validity of the vote on proposal # 6 at this year's Annual Meeting. *Cf. United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("public interest" in settling legality of defendant's practices counselled against finding of mootness). Nor is the plaintiff the only shareholder interested in the resolution of this issue. By letter dated June 2, 1992, the Reverend William Somplatsky–Jarman, an Associate for Mission Responsibility Through Investment of the Presbyterian Church (USA), informed the Court that his Church, which was a sponsor of proposal # 6, is "interested in having [its] resolution receive a fair vote". The Court believes that it deserves that opportunity.

Second, the Company's offer to resubmit this proposal at its next Annual Meeting is hardly the equivalent of a Court Order to that effect, particularly since that offer is not compelled by applicable regulations. *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 928 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981).

The recent case of *New York City Employee's Retirement System v. Dole Food Company, Inc.*, 969 F.2d 1430 (2d Cir. 1992), decided during the pendency of this motion, does not compel a contrary conclusion. In *Dole*, our Court of Appeals dismissed as moot an appeal from an order enjoining the defendant to include the plaintiff's shareholder proposal in its proxy materials. The Court vacated the District Court's injunction, and remanded with directions to dismiss. *Id.* at 1435. The critical difference between *Dole* and the case at bar is that in *Dole* the District Court *had* entered an injunction, and the defendant had complied with that injunction by including the shareholder proposal in its proxy materials. In this case, of course, there has been no adjudication of the lawfulness of the Board's response to the shareholder proposal, nor of the validity of the vote on the proposal at the May 12 Annual Meeting. Thus, this controversy is still "alive" in a way the *Dole* case was not. *See Stahl v. Gibraltar Financial Corporation*, 967 F.2d 335 (9th Cir.1992) (Kozinski, J.) (section 14(a) plaintiff permitted to maintain suit even after motion for preliminary injunction had been denied and vote at annual meeting had occurred).

Accordingly, the Court concludes that the Board's response to shareholder proposal # 6 contained both misleading statements and omissions, that such statements and omissions were made knowingly, and that they had a "significant propensity" to affect the vote on the proposal. The plaintiff's motion for summary judgment is therefore granted. The result of the shareholders' vote on proposal # 6 must be, and hereby is, voided, and the Board is directed to resubmit the proposal to a vote of the shareholders at the Company's next Annual Meeting.

Settle a judgment on ten (10) days notice or waiver of notice.

SO ORDERED.

### APPENDIX A—THE VALDEZ PRINCIPLES

#### Introduction

By adopting these principles, we publicly affirm our belief that corporations and their shareholders have a responsibility for the environment. We believe that corporations must conduct their business as responsible stewards of the environment and seek profits only in a manner that leaves the Earth healthy and safe. We believe that corporations must not compromise the ability of future generations to sustain their needs.

We recognize this to be a long term commitment to update our practices continually in light of advances in technology and new understandings in health and environmental science. We intend to make consistent, measurable progress in implementing

these principles and to apply them wherever we operate throughout the world.

### 1. Protection of the Biosphere

We will minimize and strive to eliminate the release of any pollutant that may cause environmental damage to the air, water, or earth or its inhabitants. We will safeguard habitats in rivers, lakes, wetlands, coastal zones and oceans and will minimize contributing to the greenhouse effect, depletion of the ozone layer, acid rain, or smog.

### 2. Sustainable Use of Natural Resources

We will make sustainable use of renewable natural resources, such as water, soils and forests. We will conserve nonrenewable natural resources through efficient use and careful planning. We will protect wildlife habitat, open spaces and wilderness, while preserving biodiversity.

### 3. Reduction and Disposal of Waste

We will minimize the creation of waste, especially hazardous waste, and wherever possible recycle materials. We will dispose of all wastes through safe and responsible methods.

### 4. Wise Use of Energy

We will make every effort to use environmentally safe and sustainable energy sources to meet our needs. We will invest in improved energy efficiency and conservation in our operations. We will maximize the energy efficiency of products we produce or sell.

### 5. Risk Reduction

We will minimize the environmental, health and safety risks to our employees and the communities in which we operate by employing safe technologies and operating procedures and by being constantly prepared for emergencies.

### 6. Marketing of Safe Products and Services

We will sell products or services that minimize adverse environmental impacts and that are safe as consumers commonly use them. We will inform customers of the environmental impacts of our products of services [sic].

### 7. Damage Compensation

We will take responsibility for any harm we cause to the environment by making every effort to fully restore the environment and to compensate those persons who are adversely affected.

### 8. Disclosure

We will disclose to our employees and to the public incidents relating to our operations that cause environmental harm or pose health or safety hazards. We will disclose potential environmental, health or safety hazards posed by our operations, and we will not take any action against employees who report any condition that creates a danger to the environment or poses health and safety hazards.

### 9. Environmental Directors and Managers

At least one member of the board of directors will be a person qualified to represent environmental interests. We will commit management resources to implement these principles, including the funding of an office of vice president for environmental affairs or an equivalent executive position, reporting directly to the CEO, to monitor and report upon our implementation efforts.

### 10. Assessment and Annual Audit

We will conduct and make public an annual self-evaluation of our progress in implementing these principles and in complying with applicable laws and regulations throughout our worldwide operations. We will work toward the timely creation of independent environmental audit procedures which we will complete annually and make available to the public.

APPENDIX B—INTERNATIONAL
PAPER'S "IMPLEMENTING
GUIDELINES"

The implementing guidelines are designed to help International Paper achieve compliance with the principles. Although grouped under certain principles, some guidelines may be equally applicable under several different principles and should be used accordingly. In the interest of clarity, however, the guidelines have been listed only once. Additionally, any number of the guidelines complement one another and may be considered together when gauging performance.

These guidelines are also by no means an exhaustive list. In fact, the guidelines are to be considered a fluid document, subject to changing conditions and events. Both the principles and guidelines will be revisited regularly.

*Principle # 1:* To make environmental, health and safety considerations priorities in operating existing facilities, as well as in planning new operations.

Implementing Guidelines

International Paper recognizes the importance of operating in a manner that is safe for both mankind and the environment. In order to accomplish this objective, International Paper adopts the following guidelines for implementing this principle:

1. Seek Improvement.

Strive to eliminate environmental, health and safety concerns in company operations and to seek out areas for continual improvement.

2. Compliance.

Develop, implement and enforce policies, plans and procedures in order to achieve compliance with environmental, health and safety laws and regulations.

3. Sound Practices.

Use sound practices in the environmental, health and safety areas.

4. Corporate Planning.

Make environmental, health and safety considerations an integral part of strategic planning and capital budgeting processes in order to anticipate and manage future concerns.

5. Corrective Action.

Initiate corrective action immediately if a situation arises which may lead to significant adverse effects on employees, the public or the environment.

6. Learning Opportunities.

Use operating experiences to reassess performance and to make appropriate short and long-term improvements in operations.

*Principle # 2:* To recognize, in developing and designing products to meet customer needs, the environmental, health and safety effects of product manufacture, distribution, and use and disposal.

Implementing Guidelines

International Paper is dedicated to safe and environmentally sound products, packaging and operation. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Risk Reduction.

Develop programs and monitor their effectiveness in reducing environmental, health and safety concerns in product manufacture, distribution use and disposal.

2. Invest.

Continue the ongoing financial commitment to environmental, health and safety protection.

3. Provide Information.

Provide customers and communities with pertinent information relating to the environmental, health and safety concerns of product manufacture, distribution, use and disposal.

4. Pollution Prevention.

Consider available measures, including source reduction or substitution, external treatment and engineering controls in deciding how best to prevent or reduce pollution, particularly when constructing new facilities, making modification to existing ones, or designing new products.

*Principle #3:* To monitor its environmental, health and safety performance and to report regularly on these matters to the Board of Directors, as well as to confirm its adherence to these principles annually to the American Paper Institute.

Implementing Guidelines

International Paper encourages its employees to assess on a continuing basis its performance in the environmental, health and safety areas, and to confirm publicly its adherence to high standards and its dedication to improvement. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Performance Assessment.

Develop internal environmental, health and safety goals and programs, with mechanisms in place to assess operations and progress.

2. Management Practices.

Appoint an upper management individual(s) or committee(s) to guide and lead corporate activities concerning environment, health and safety issues.

3. Facility Accountability.

Designate a responsible individual(s) at each manufacturing location to be accountable for environmental, health and safety activities.

4. Coordinate/Communicate.

Coordinate activities and information on environmental, health and safety matters among local managers, corporate environmental staff and senior management.

*Principle #4:* To train employees in their environmental, health and safety responsibilities, and to promote awareness and accountability on these matters.

Implementing Guidelines

The commitment of International Paper employees to these responsibilities, and their ability to implement that commitment, is key to the success of any corporate effort. In order accomplish this objective, International Paper adopts the following guidelines for use in the implementing this principal:

1. Organizational Commitment.

Develop and implement education, training and communication programs on environmental, health and safety policies and procedures for employees, stressing the importance of compliance with the law.

2. Regular Review.

Conduct regular reviews of employees' compliance with applicable regulations and company requirements.

3. Recognize Effort.

Encourage and recognize individual and team efforts to improve environmental, health and safety performance.

4. Disciplinary Action.

Take appropriate disciplinary action against employees who fail to follow environmental, health and safety policies, procedures and regulatory requirements.

5. Encourage Involvement.

Encourage employees to participate in activities and technical organizations which focus on environmental, health and safety concerns, as well as to pursue continuing education in these areas.

*Principle #5:* To improve environmental, health and safety performance through support of research and development that advance the frontiers of knowledge.

Implementing Guidelines

International Paper will continue its decades-long involvement in supporting inno-

vations and creativity in seeking solutions to environmental, health and safety concerns. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Prioritize.

Focus effort and resources on the most significant environmental health and safety issues.

2. Cooperate.

Pursue opportunities for greater cooperation among all sectors in identifying, prioritizing, managing and funding environmental, health and safety initiatives.

3. Share Ideas.

Promote sound environmental, health and safety principles and practices throughout the industry and share ideas consistent with proprietary and legal considerations.

Recognize the international dimensions of environmental, health and safety concerns and support efforts to share knowledge and to develop sound solutions through international cooperation.

*Principle # 6:* To communicate with employees, customers, suppliers, the community, public officials and shareholders to build greater understanding on environmental, health and safety matters.

Implementing Guidelines

International Paper recognizes the need to share with interested parties reliable, straightforward and scientifically-based information. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Be Responsive.

Respond accurately and promptly to questions and concerns of interested parties, particularly in the event of a situation which may require corrective action.

2. Outreach Programs.

Seek out interested parties regularly and communicate on company and industry activities and performance.

3. Encourage Open Dialogue.

Work with others to address concerns and to reach consensus on important issues.

4. Listen.

Carefully evaluate criticisms and complaints concerning industry activities.

5. Support Education Initiatives.

Support information exchange programs and environmental education efforts—both through individual programs and through cooperative ventures.

6. Regular Evaluation.

Regularly evaluate the effectiveness of the ongoing communications effort.

*Principle # 7:* To participate constructively in the development of public policies on environmental, health and safety matters.

Implementing Guidelines

International Paper has an obligation to involve itself in public policy development and to offer its knowledge, experience and expertise in the quest for sound laws and regulations. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Be Involved.

Work with government entities in the development of public policies that are based on sound scientific principles and economically achievable technologies.

2. Employee Participation.

Encourage employees to contribute to the development of industry positions through involvement in internal company deliberations, trade associations and/or technical organizations.

**1152**

3. Start Early.

Keep aware of progress on issues so contribution can be made during the development process.

4. Educate Officials.

Inform and educate public officials regularly on the nature of company activities and their compatibility with environmental, health and safety goals.

*Principle #8:* To continue to pursue energy conservation, increased energy efficiency, greater utilization of alternatives to fossil fuels and opportunities for cogeneration of electricity.

Implementing Guidelines

International Paper will continue to emphasize the efforts it began after the energy crisis (1973) to reduce fossil fuel usage and to improve its energy efficiency through process improvements and the increased cogeneration of electricity. In order to accomplish this objective, International Paper adopts the following guidelines for use in implementing this principle:

1. Alternative Energy.

Increase utilization of renewable domestic energy sources and process residues, primarily wood residues, spent pulping liquors and hydropower.

2. Efficiency.

Enhance energy efficiency through improvements of product and process technologies.

3. Cogeneration.

Continue expanding the company's ability to self-generate electricity from alternative fuels—including wood residues and nonrecyclable recovered paper—as well as from clean burning domestic fossil fuels.